TRACY (UNITED STATES v.). See Case No. 16,536.

TRACY v. WALER. See Case No. 14,129.

## Case No. 14,129.

TRACY et al. v. WALKER et al.

[1 Flip. 41;[1] 3 West. Law Month. 574.]

Circuit Court, N. D. Ohio.   Nov. Term, 1861.

PARTNERSHIP — PARTNERSHIP EFFECTS — THE EFFECT OF DISSOLUTION—PARTNERSHIP DEBTS —JOINT TENANTS.

1. Mercantile partners are joint tenants in the stock and effects of a copartnership. Each member of the firm has a specific lien upon the assets, but this is not applied only to property and effects brought into the concern at its organization, but to everything else coming in lieu thereof during the continuance, or after the determination, of the partnership.

2. Upon dissolution, the lien of the individual members of the firm continues, as well for the indemnity of each as for his proportion of the surplus.

3. In strict law, creditors have no lien upon the partnership property for their debts. It is only worked out through the equity of the partners, over the whole funds, in a court of chancery.

4. The property of the company should be, first, liable for the debts of the company, and joint creditors should have a priority or privilege of payment before separate creditors. These are rights which the law secures to each and all the members of the firm. But they may relinquish these rights to one and the other, or to third persons, or they may enforce them in a court of equity for their own benefit, or become the instrument by which creditors may, in like manner, enforce them for the benefit of creditors.

5. The general creditors of a firm, before levy or seizure have not, as such creditors, any specific lien on the assets of the firm, and the preference of the creditors of the company over the separate creditors in the distribution of the joint assets arises from, and must be worked out through, the rights of the partners to insist upon such application.

6. Mere insolvency, in the absence of fraud, will not deprive the partners of their legal control over the property, or of their right to sell and dispose of it as to them shall seem just and proper.

7. Where the retiring partner sells and transfers all his interest in the partnership to his copartner, who thereupon assumes exclusive control over it and disposes of it to bona fide purchasers, the former should not be permitted to follow such property into the hands of third persons, but should be remitted to his action at law for a breach of the agreement.

8. Fraud may be inferred from facts and circumstances that work an imposition and deceit on other persons, who are not parties to the fraudulent agreement.

[This was a suit to enforce the payment of a judgment by Frederick Tracy and James Irwin against Joseph Walker, Thomas W. Ouland, William C. Hedges, and others.]

WILLSON, District Judge. This cause was heard upon bill, answers, replication, exhibits

and testimony. The complainants are judgment creditors of the late firm of Walker & Ouland, of the city of Tiffin, Ohio. They seek, by this proceeding, to subject certain equities in the hands of some of the defendants, to the payment of their judgment.

The leading facts, disclosed by the record, are not controverted. In the fall of 1856, the defendants, Walker & Ouland, were a mercantile firm of good credit, doing business at Tiffin. They had purchased goods of the complainants, from time to time for cash, and on deferred payments. One of their notes for $570.41, matured on the 15th of May, 1857, and was protested for non-payment. The complainants, becoming anxious about the safety of their claim, immediately called upon Walker for security, but failed to obtain it. On the third day of June, 1857, they again attempted to obtain security, and for that purpose sent their agent to Tiffin. Walker then and there made an exhibit of the affairs of the concern to this agent, in which he represented the assets at his disposal to be worth $54,500, and the liabilities of the firm of Walker & Ouland not to exceed $13,000, leaving an excess of assets over liabilities in his hands of $41,500. Upon this representation the paper was renewed without security. On the same day, to-wit, the 3d of June, 1857, Walker sold and transferred all of the aforesaid property and assets to his father-in-law, Josiah Hedges, and other relations, in payment of his own individual liabilities. It appears, that some time in the spring of 1857, Ouland sold to his partner his entire interest in the property and effects of the firm, and in retiring from the concern took Walker's agreement to furnish him a bond of indemnity with good security, against the liabilities of the firm, which bond of indemnity has never been given. It further appears, that the complainants obtained judgment against Walker & Ouland in this court at the July term, 1857, for $684.25 damages, upon said renewed note. Execution was issued on the judgment in January, 1859, and duly returned by the marshal, but he found no goods, chattels, lands or tenements, of either Walker or Ouland on which to levy. The judgment remains wholly unsatisfied, and it is conceded that both Walker and Ouland are insolvent.

It is insisted by the complainants—1st—that the creditors of the firm of Walker & Ouland have an equitable lien upon the property and assets of the partnership, and that such property cannot be diverted to the payment of the individual debts of the partners, to the prejudice of the creditors of the firm. 2nd—That if such lien shall be held not to exist, it is nevertheless insisted, that the sale by Walker to Hedges and others was, in fact, fraudulent, and therefore void.

Mercantile partners are joint tenants in the copartnership stock and effects. Each has a specific lien upon the assets. This lien is not only applied to the property and effects

[1] [Reported by William Searcy Flippin, Esq., and here reprinted by permission.]

brought into the concern at its organization, but also to everything coming in lieu thereof, during the continuance, or after the determination of the partnership. Upon a dissolution, the lien of the individual members of the firm continues, as well for the indemnity of each as for his proportion of the surplus. But, in strict law, creditors have no lien upon the partnership property for their debts. It is only worked out through the equity of the partners, over the whole funds, in a court of chancery. That the company property should first be liable for the company debts, and that joint creditors should have a priority or privilege of payment before separate creditors, are rights which the law secures to each and all the members of the firm. They may relinquish these rights to one and the other, or to third persons, or they may enforce them in a court of equity for their own benefit, or become the instruments by which creditors may, in like manner, enforce them for the benefit of creditors. Hence, when the primary rights of partners to apply the partnership property to the extinguishment of the company debts is gone, the right of the partnership creditors to enforce the application of the property of the firm to the payment of their debts, is also gone. That the general creditors of a firm before levy or seizure, have not, as such creditors, any specific lien on the assets of the firm, and that the preference of the company creditors over the separate creditors in the distribution of the joint assets, arises from, and must be worked out through, the rights of the partners to insist upon such application, are principles now too well established to admit of question. Sigler v. Knox County Bank, 8 Ohio St. 511; 5 Ohio St. 101, 516; 11 Ohio, 399; Ex parte Ruffin, 6 Ves. 126–129; Ex parte Williams, 11 Ves. 3; Hoxie v. Carr [Case No. 3,802]; Story, Partn. § 357 et seq.

Nor does the right of appropriation of the joint assets to the separate creditors, by consent of the other partner, depend upon the solvency of the firm. "Mere insolvency, as commonly understood, no fraud intervening, will not deprive the partners of their legal control over the property, and their right to sell and dispose of it as to them shall seem just and proper." A contrary rule would produce incalculable mischief and great inconvenience, and would be attended with absolute injustice to bona fide purchasers of such property. But, it is said, that in this case, the legal right, title and interest of Ouland in the partnership effects, never passed to Walker, inasmuch as the latter failed to comply with his agreement to give bond with surety, against the company debts. And the objection is put on the ground, that the agreement between the parties was executory. The case of Ex parte Rowlandson, 1 Rose, 416, would seem to sustain this doctrine. In that case, after a dissolution and assignment of the partnership effects to one of the partners, a bill was filed by the retiring partner against the other, alleging fraud in the non-performance of the articles of dissolution, and praying an injunction and receiver, which was ordered. It was held, that such interference of the court, arising from the non-performance of the articles, restored the property to its original character as joint property, unless the plaintiff in equity, by his conduct, rendered nugatory the effect of such interference. But in Young v. Keighly, 15 Ves. 558, where the agreement to convert separate into joint property was only in part performed, the court treated the conversion as complete.

It seems just and reasonable, that where the retiring partner thus sells and transfers all his interest in the joint property, to his copartner, who then assumes exclusive control over it, and disposes of it to bona fide purchasers, he should not be permitted to follow such property in the hands of third persons, but should be remitted to his action at law for a breach of the agreement. As between the partners themselves, when the property has not changed hands, a court of equity will always interpose and protect one of them against the fraudulent contract or fraudulent conduct of the other, and for that purpose will appoint a receiver, and finally adjust the affairs of the partnership. But what are the facts of the case in this regard? In the spring of 1857, Ouland sold to Walker his interest in the concern, including the goods in the store and the entire assets. Walker took exclusive possession, and exercised absolute control over them. He traded them off on his own account, paid company and private debts from their proceeds, without objection or interference on the part of Ouland. So far as his dealing with third persons was concerned, they had a right to treat and regard such property as his own, and they should be protected in the purchase of it, when made in good faith, unless such purchase was tainted with fraud.

And this brings us to the consideration of the other branch of the case, to-wit: Was the transfer of the property from Walker to Hedges and others, attended by such circumstances of fraud, as to vitiate the sale of the property, or any part of it? When Pratt, the plaintiff's agent, called upon Walker for security, early in June, 1857, the latter evidently made false statements as to his solvency. By these false representations, he obtained a renewal of the note, and thereby gained sufficient time to dispose of the property in question, to his father-in-law, without any hindrance from the plaintiffs, by attachment proceedings, or otherwise. The individual indebtedness of Walker to Josiah Hedges, on the 3d of June, 1857, is alleged to have been $10,608. On that day, Walker assigned and delivered to Hedges, certain of his book accounts, amounting to $865.53, and also put into Hedges' possession, goods in the store valued at $12,385.55, of which amount it is

claimed $9,742.55, were applied in payment of the indebtedness of Walker to Hedges. It appears from the testimony of Pratt, that on the 5th of June, 1857, finding Walker's store and stock of goods in the possession of Hedges, he called upon the latter for an explanation of the transfer. In his testimony, in relation to this interview, Pratt declares that he (Hedges) said, "The goods in the store all belonged to him—that he had bought them of Walker. I asked him the consideration, and he replied that Walker owed him a great deal more than he could get out of the goods, and that the indebtedness was for money borrowed a long time ago." It further appears, that afterward, Walker disposed of a portion of the goods thus held by Hedges, to Reed, Jennings & Co., and other creditors, in compromise or payment of the debts of Walker & Ouland, and that the goods so disposed of amounted to $2,643. The effect of this transaction, so far as the $2,643 worth of goods is concerned, was a direct fraud on the complainants. The legal representatives of Josiah Hedges have failed to explain the transaction upon any ground consistent with fair dealing. An inventory of the goods was made at the time of the alleged transfer, and a bill of sale to Hedges was drawn up and executed by Walker. These papers have not been produced in evidence. Their non-production forces upon us the conviction, that the goods, to the amount of $2,643 at least, were covered up by Hedges, either to defraud the complainants, or to hinder and delay them in the collection of their debt, and to enable Walker to force a compromise with his creditors on terms favorable to himself.

In the celebrated case of Chesterfield v. Janssen, 2 Ves. Sr. 155, Lord Hardwicke, after remarking that a court of equity has an undoubted jurisdiction to relieve against every species of fraud, declares that to be fraud which may be collected and inferred, in the consideration of a court of equity, from the nature and circumstances of the transaction, as being an imposition and deceit on other persons not parties to the fraudulent agreement.

Without impinging the application of the $9,743.55 to the payment of Hedges' debt, or inquiring into the validity of the sales made by Walker to Baldwin and other defendants, it is sufficient to answer the purposes of equity in this suit to charge the estate of Josiah Hedges for the payment of the complainants' judgment and costs, and this, in consideration of the fraudulent conduct of the parties in relation to the $2,643 worth of goods taken by Hedges in excess of his claim. A decree will be entered accordingly.

The claim of Hedges was only for $10,608, June 3, 1857. He received on that day $865.53 in book accounts, and $12,385.55 in goods.